IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05CR301-WHA |
| | ) | |
| MICHAEL DAVID KING | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on the defendant's Motion to Suppress, filed on 23 June 2006 (Doc. # 23).  The government filed its response on 21 July 2006 (Doc. # 31), and on 4 August 2006, the court conducted an evidentiary hearing on the motion (Doc. # 32).[1]

Based on the parties' pleadings and the evidence adduced at the evidentiary hearing, the Magistrate Judge recommends that the motion be denied.

## I.    FACTS[2]

### A.    *Defendant's Expectation of Privacy*

In February 2003, the defendant, Michael David King ["King"], was a six-year

---

[1]The evidentiary hearing was initially set for 11 July 2006 (Doc. # 24), but on the government's motion (Doc. # 25), it was continued to 4 August 2006 (Doc. # 26).  The government filed a second motion to continue the hearing on 20 July 2006 (Doc. # 28), but the motion was denied (Doc. # 29).  The trial of this case has now been continued to 8 January 2007 ( # 48).

[2]Admitted as documentary evidence at the hearing for the defendant were (1) the search warrant and affidavit, dated 27 February 2003 (DX-1); and (2) the statement of Jennifer LaMar, dated 27 February 2003 (DX-2); and the defendant's resumé (PX-3). Admitted as the government's exhibits were (1) statement of Henry Lopez, dated 27 February 2003 (GX-1); United States Department of Defense Warning Statement (GX-2); and General Order Number 1-a, dated 19 December 2000 (GX-3).

civilian contractor assigned to a private room in a dormitory at the military housing facility of Prince Sultan Air Base, Saudi Arabia (TR. 15). He left Saudi Arabia that same month (TR. 32).

Prior to becoming a military contractor, King had a 20-year career in the United States Air Force who's principal work was "involved in the security aspect of computers" (TR. 17). At that time, he owned a Dell Dimension, C-840 laptop computer that he purchased from Dell (TR. 16). He maintained the computer in his dormitory room, and sometime in 2002, he installed security settings on it (TR. 16-17, 31).[3] King articulated the effect of his security settings as follows:

> The local policy I established should have prevented anybody other than the person physically at the keyboard from accessing any files on my computer.

(TR. 17).[4]

In spite of his security settings, the government, principally through GX-2, the United States Defense Warning Statement, advised users of the government's network that "they're subject to monitoring of . . . their traffic and activities . . . for the normal routine

---

[3]King stated that the security settings were installed via a software program called Secure Policy dox MSC. The program, which "establish[ed] security permissions on the computer itself", were designed to "restrict access to only the local logged-on user . . . the person at the keyboard, and to restrict any access from the network, as well as file permissions being set to also allow only access from the local machine" (TR. 17).

[4]In fact, according to King, the settings were also designed to block access by anyone on the network, and even a person other than he who actually used his computer "would have to be logged in using [his] account". No one else had King's password (TR. 17-18, 45).

maintenance and health of the network (TR. 18).[5]  King was aware of the warnings and had

learned about them in his government training classes (*Id.*).  According to King, although the

government may engage in monitoring to maintain the health and welfare of the network,

if the government wishes to focus upon a specific individual account or an individual's

computer, "that requires a search and search authority" (TR. 19).  He also stated that, for

those reasons, he "absolutely" believed that he had a right to privacy in stored items on his

computer (TR. 22), and that he did not give anyone permission to search those items (TR.

23).[6]

It was clearly possible for an individual to grant the government "permission" to

monitor stored files on a given computer.  The process for doing that was the establishment

of something called a "share".  A share is

> The process that's done on a computer that says these files –
> this folder or these files are made available under this name, and
> it has individual permissions assigned to it at that  - when it's
> created.

(TR. 27).  King had not facilitated or authorized a share on his computer, and he believes that

"the network administrators applied an improperly formatted group policy object which

---

[5]King explained that the primary purposes of monitoring were virus protection and investigation of unusual activities, such as "an unusual amount of traffic".  When that happens, "logs are reviewed to determine if that machine has something that may affect the network adversely".  Officials can also monitor to determine the sites that a computer is accessing or to determine if they are authorized sites (TR. 21-22).

[6]King said that the government has consent forms for individuals to sign which give permission to search computers, but he didn't sign one (TR. 24).

caused a share to be created without security permissions attached to it (TR. 28).

In spite of his security settings, King acknowledged that he never did anything to determine whether they were effective, i.e., whether they actually prevented monitoring of his stored files (TR. 27).[7]  In that connection, in a statement admitted as GX-2, one Sgt. Lopez, who was involved in monitoring computer files at the Base, encountered files on King's computer while searching for music files (TR. 27-28).

King described a "group policy" or "network policy" pursuant to which a share could be created.  Moreover, he acknowledged that "network policies override local policies" and that his attempt to secure his information on his personal laptop was a local policy (TR. 29). However, he insisted that when he established his local policy by installing security settings on his computer, he was not aware that the global policy advanced by network administrators could override local policy (TR. 30). King learned that in October 2005, by which time he had been out of Saudi Arabia for 2 ½ years (TR. 31, 32).

**B.     *The Search And Its Enabling Processes***

Sgt. Jennifer LaMar ["LaMar"], a senior airman who was the base information protection officer, was stationed at Prince Sultan Air Base at the same time as King (TR. 36,

---

[7]By comparison to other secured spaces, King's failure to ascertain the effectiveness of his settings was tantamount to his locking a door without checking to see if he could enter or conducting a private conversation on a bus without making sure that no one other than the intended listener could hear him.  In both situations, the failure to *assure* privacy dilutes the *expectation* of privacy.

37).  For purposes of analyzing the issues in the instant motion, her expertise at the time

appears to have been at least equivalent to King's (See TR. 36-37).  While on duty, she spent

most of her time researching General Order-1 violations, which she further described as

follows:

> Anything that dealt with a woman being exposed between the
> neck and the knees, which was considered offensive to the Saudi
> Arabians.   That included web searching.  We had another area
> of the office that took care of e-mails . . .

(TR. 37).

She learned of King's alleged web activities when she received an e-mail indicating

that pornographic material had been found "on a computer in the domain while somebody

was out searching for music" (TR. 37-38).  In fact, in GX-1, Sgt. Henry Lopez ["Lopez"],

another airman in Saudi Arabia, stated that he discovered the files after he "found a computer

that had the C drive shared out" (TR. 39).

Lopez reported his discovery to a criminal investigator, Sgt. Eric O'Brien

["O'Brien"], who in turn, contacted LaMar and directed her to search for the information that

Lopez referenced (TR. 64).  LaMar then notified her supervisor, who authorized her to

search, whereupon she "immediately found . . . the porn video that was mentioned and from

there, found some text files of explicit stories as well" (TR. 38).  She also found a subfolder

called "pedophilia", but she found no pictures in it.  At that time, she had not focused upon

any individual (TR. 38).[8]

To identify the person responsible for the files, LaMar noted the profile on the computer, learning that it was labeled <King.Michael>.  LaMar concluded from the profile that King "was the only person to have ever logged onto that computer (*Id*.).  LaMar also determined King's identity by looking at "proxy files", which she described as

> log files that are stored by what's called a proxy server. Anytime somebody accesses the worldwide web from a base, such as Prince Sultan Air Base, they have to go through our proxy server.  What that does, it keeps track of everywhere they go, and it stores them all in these log files.

(TR. 40).

Next, LaMar sought to connect King's name in his text files with the porn video. Explaining that everyone's profile on a computer "stores recent documents that they [sic] have opened up", LaMar found "links to the porn video in Mr. King's profile on that computer" (*Id*.).  According to LaMar, the folders containing the pornographic material were "owned by the local administrator's group" (TR. 41).  Specifically,

> Anytime a computer is placed on a computer, it's  - by default, it is owned by the local administrator's group.  If someone were to want to hide a file or keep other people out of it, they would take away the administrator's group from being the owner. They would make themselves owners of it and take away everybody's permissions.

(TR. 41).  LaMar acknowledged that she conducted an extensive search without a search

---

[8]LaMar also testified that using the path identified on the drive, she could have determined the computer's location on the base without searching any individual files on the computer, but she did not do that (TR. 39).

warrant.[9]    None of the pictures that she viewed reflected child pornography, and, upon reviewing the proxy logs, she found none that violated General Order 1 (TR. 52).[10]

LaMar then described the method, available in 2003, by which a user who desires to install security settings can "remove everybody else but yourself", and thereby hide the file to the extent that, if she tried locate it, she and Lopez "would have . . . no way of finding anything" (TR. 40-41). She also emphasized, however, that given the accessibility of King's files at that time, "[e]verybody on the entire network could see the exact same thing that I saw and that Mr. Lopez saw" (TR. 42).

In summary, LaMar implicitly stated that King's files were available for viewing because he didn't establish sufficient or correct security settings. She didn't employ any special means to get into his files, nor was she aware of any action taken by the network administrator to override his local security settings (TR. 42). In pertinent testimony, LaMar declared that, although King assigned himself a private password,[11] it wasn't necessary to use that password to gain access to his files. Instead, once King "plug[ed his computer] into one of the switches and join[ed] it to the domain" he becomes "a member of the domain", and, as a result, "anybody who had a network account on [Prince Sultan Air Base] could access

---

[9]The government's counsel admitted at the hearing that, at the time LaMar searched King's files, "the authorization to search had not yet been obtained" (TR. 54).

[10]LaMar's search was limited to stored files. She did not know, and could not determine, whether King or anyone else was actually using the computer to access the internet during her search (TR. 56).

[11]She acknowledged that, once King assigned himself a password, no one else had it (TR. 45).

7

those files", adding significantly, that "[i]t has nothing to do with his user name or password" (TR. 44, 45).[12]

LaMar also insisted that neither she nor anyone else would have had access to King's files if he hadn't "had them shared out" by some affirmative action of his own (TR. 48). After describing the method for doing so, she said that, for others to have access to King's files, "it would have had to have been done.  The files are not shared out by default using a share name, the share name that was listed" (TR. 48-49).  She also stated that even if King had secured his files, they would still have been available to administrators  -  and LaMar was an administrator on the Base in 2003 (TR. 49).  In other words, the administrative shares are set by default (TR. 50).

LaMar was not aware of any notice to users that administrative shares are set by default; nor was she aware of any regulations that required that such notice be given (TR. 50).[13]

C.    *The Search Warrant*

When he found King's files, in addition to notifying LaMar, Lopez notified Sgt.

---

[12]LaMar stated that "thousands" of persons on the network had access to King's files (TR. 45).

[13]According to LaMar, King could not have eliminated an administrator's access to this files unless he were an administrator himself  - he could then "remove everybody but [himself] from the administrator's group".  It was also possible to "password protect" his files, but the files she viewed were not protected by password (TR. 51).

O'Brien, who, at the time, was a criminal investigator on the base (TR. 59). His immediate commander was Lt. Col. Ferguson, who was chief of security forces (*Id.*). O'Brien interviewed Lopez and secured a written statement from him (GX-1). According to O'Brien, Lopez was not acting as a criminal investigator at the time he encountered King's files (TR. 60).

When LaMar notified O'Brien of her findings, he secured an authorization to search King's computer from the military magistrate, Col. Cheryl Dozier ["Dozier"] (TR. 61). O'Brien had never met Dozier before requesting the search warrant, and Dozier was not involved in the investigation of King's computer files (TR. 62).

O'Brien never searched King's computer files, and he had no authority to do so (TR. 65). He also acknowledged that the information he received from Lopez, standing alone, was not sufficient for him to obtain a search warrant (TR. 66). The search warrant permitted officials to secure the computer physically and to conduct a further search of its files (TR. 68). He did go to King's room, however, to secure the computer; it was his first time there (*Id.*).

## II.  DISCUSSION

### A.    *The Parties' Contentions*

Relying on his "privacy expectation in his dorm room", King contends that "the search and seizure of his private room of the military installation in the country of Saudi Arabia was conducted in violation of the Fourth Amendment to the United States

constitution."  He specifically contends that the search warrant

- lacked probable cause to support the search of his room and the seizure of items from his room,

- "was not issued by a neutral and detached magistrate, and

- "was based upon a warrantless search conducted by [a] U.S. Air Force Protection Officer . . . . "

(Doc. # 23).

The government counters by alleging that (1) King had no reasonable expectation of privacy, (2) the search was a proper government workplace search, (3) presentation of the search warrant application to the military magistrate satisfies the neutral magistrate requirement, (4) the affidavit established probable cause, and, in any case, (5) the good faith exception to the exclusionary rule applies in this case.


**B.    _Standard of Analysis_**

A court reviewing the issuance of a search warrant by a magistrate or state court judge is to decide whether the evidence viewed as a whole provided a "substantial basis" for the finding of probable cause at the time the warrant was issued.  _Massachusetts v. Upton_, 466 U.S. 727, 732-33 (1984)(per curiam); _Illinois v. Gates_, 462 U.S. 213, 236 (1983).  The reviewing court must decide whether there was a "substantial basis" solely upon consideration of the information presented to the issuing judicial officer.  _United States v. Lockett,_ 674 F.2d 843 (11th Cir. 1982).  In conducting such a review, the court must give

10

deference to the decision of the issuing judge even in marginal or doubtful cases.  *Id*. at 845.

The traditional standard for review of a judge's probable cause determination is whether the judge had a "substantial basis for . . . [concluding]" that a search would uncover evidence of wrongdoing.  The ***Gates*** court affirmed this long-standing principle enunciated in ***Jones v. United States***, 362 U.S. 257, 271 (1960).  That holistic view of the evidence has been consistently affirmed in the Court of Appeals.  See, e.g., ***United States v. Clay***, 355 F.3d 1281, 1283 (11th Cir. 2004).


**C.     *Warrantless Search of Computer***

King also contends that the officers conducted an impermissible warrantless search of his computer.  Citing ***Katz v. United States***, 389 U.S. 347, 351-352 (1967), King argues that he had a privacy interest in his computer files.  The government in contrast, argues that the investigation of King's computer files was an attempt to investigate violations of workplace rules and was therefore lawful.

In ***Katz***, the defendant was convicted of  transmitting wagering information by telephone from Los Angeles to Miami and Boston, in violation of a federal statute.   The government introduced evidence at the trial of his end of the telephone conversations, overheard by FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls.

Although the defendant cited as a critical issue "[w]hether physical penetration of a constitutionally protected area is necessary before a search and seizure can be said to be

violative of the Fourth Amendment to the United States Constitution," **Id.** at 350, the court

rejected that formulation.  The court's succinct initial analysis is nearly dispositive of the

issue in this case:

> [T]he Fourth Amendment protects people, not places. What a
> person knowingly exposes to the public, even in his own home
> or office, is not a subject of Fourth Amendment protection. *See*
> *Lewis v. United States*, 385 U.S. 206, 210; *United States v. Lee*,
> 274 U.S. 559, 563. But what he seeks to preserve as private,
> even in an area accessible to the public, may be constitutionally
> protected.  *See Rios v. United States*, 364 U.S. 253; *Ex parte*
> *Jackson*, 96 U.S. 727, 733.

**Katz v. United States**, at 351-352.  The court nevertheless held that the warrantless electronic

surveillance of the telephone booth offended the Fourth Amendment.


1.    **Expectation of Privacy**[14]

---

[14]    At the outset of this analysis, it is necessary for the Magistrate Judge to
reverse a finding made at the evidentiary hearing that King had a reasonable expectation
of privacy in the computer files on his computer.  The reversal is triggered by a re-
examination of King's motion, the government's evidence, and further consideration of
the circumstan- ces of King's use of his computer.  In any case, King's motion clearly
states his privacy claim:

> Defendant King contends that the search and
> seizure of his private room of the military
> installation in the country of Saudi Arabia was
> conducted in violation of the Fourth Amendment
> to the United States Constitution.  The defendant
> has a privacy expectation in his *dorm room*.

(Doc. # 23, p. 4) (Emphasis supplied).  King's specific privacy claim,
therefore, pertains to his dormitory room, not his computer.

*Katz* is distinguishable from this case on several grounds.  First, unlike the defendant in *Katz,* who had no reason to believe that his telephone conversations were monitored, King did not have an expectation of privacy in his computer files.  Although he testified that he established a "local policy" designed to prevent "anybody other than the person physically at the keyboard from accessing any files on [his] computer (TR. 17), he was advised that, as a user of the government's network, his files were "subject to monitoring . . . . for the normal routine maintenance and health of the network (TR. 18).  King acknowledged that he was aware of the warnings (*Id*.).

Moreover, King acknowledged that he never took any steps to ascertain that his attempts to secure his files were effective; thus, he never determined that others were prevented access to his files (See TR. 27).[15]  That is precisely why Lopez "encountered" King's files while he was searching for music files (TR. 27-28).  LaMar's testimony was even more damning to King's expectation of privacy.

Second, the government's intrusion upon Katz was specifically designed to monitor his conversations, and he had no notice whatsoever of the actual monitoring or the likelihood or possibility of monitoring.  In contrast, King knew fully well that the government monitored computer use on the base to maintain the health and welfare of the network (TR. 19).  In addition, LaMar testified at length about the establishment of an "administrator's

---

[15]In any case, LaMar testified that even if King had secured his files, they would still have been available to administrators  -  and LaMar was an administrator on the Base in 2003 (TR. 49)

share" on the network of which King's computer was a part, pursuant to which computer files are made available to an administrator. That availability enabled an individual to "monitor or determine the sites that a computer is accessing or to determine if they are authorized sites (TR. 21-22).

The administrator's share amounted to permission to monitor King's computer, even though he had not explicitly granted any such permission. It was not unlike other computer networks where an individual's private electronic files are maintained at the user's risk.[16] LaMar acknowledged that she conducted an extensive search of King's files, and the record establishes that she did so without a warrant (TR. 54). However, she testified, without dispute, that given the accessibility of King's files at that time, "[e]verybody on the entire network could see the exact same thing that I saw and that Mr. Lopez saw" (TR. 42).[17] In the face of this evidence, the court is compelled to conclude that King had no expectation of privacy and that the court's ruling in *Katz* affords him no protection.

2.    *Workplace Search*

---

[16]In fact, as LaMar stated, a computer that is connected to a network is "owned by the local administrator's group" (TR. 41).

[17]It is likely that the administrator's share was created without King's knowledge before he went to Saudi Arabia. He acknowledged that, in reference to "inherited permissions", that "[i]f a person is set at the top level of a folder, then it is inherited all the way down through all the contents of the folder. And creating the share as a public folder would grant everyone full control of every file in the share. (TR. 72-73). Thus, King fully understood the *risk* of exposure of his files, if not the actual exposure.

14

Arguably, in the absence of an expectation of privacy, King lacks standing to challenge the search of his computer files.  Standing aside, however, the search conducted by LaMar was designed to determine whether King  - or anyone -  was violating workplace rules.  LaMar was the base information protection officer whose job responsibility was focused upon detecting what she called General Order-1 violations (visual images exposing women "between the neck and the knees") (TR. 37).[18]  Her job included web searching.

The Supreme Court affirmed almost two decades ago that "[the] fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.'" ***New Jersey v. T.L.O.***, 469 U.S. 325, 340 (1985) (*quoting* ***Almeida-Sanchez v. United States***, 413 U.S. 266, 277 (1973).  Applying the rationale in New Jersey, the Supreme Court concluded in ***O'Connor v. Ortega***, 480 U.S. 709, 722 (U.S. 1987), that "special needs, beyond the normal need for law enforcement make the . . . probable-cause requirement impracticable," 469 U.S., at 351

> for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct. A standard of reasonableness will neither unduly burden the efforts of government employers to ensure the efficient and proper operation of the workplace, nor authorize arbitrary intrusions upon the privacy of public employees. We hold, therefore, that public employer intrusions on the constitutionally protected

---

[18]LaMar explained that the policy arose from the military's concern that Saudi Arabian customs be respected (TR. 37).

privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable.

The *O'Connor* court established a twofold inquiry for determining the reasonableness of workplace an intrusion or search: "first, one must consider 'whether the . . . action was justified at its inception,' [citation omitted]; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' ibid." [citation omitted]. 480 U.S.

In the instant case, the search was justified at its inception and its scope was reasonably related to the circumstances which justified the interference. First, the offending information was accidentally discovered - i.e., it was a non-investigatory discovery. Lopez merely encountered the an e-mail indicating pornographic material while he was searching for other material. He dutifully reported that information to LaMar, whose job was to monitor computer use for offensive images. As the court has previously explained, she carefully conducted a monitoring and a search. As a result, she found a "porn video" and "some text files of explicit stories as well". She also found a subfolder labeled "pedophilia" with no pictures (TR. 38). In the context of her responsibilities and General Order-1, That was certainly sufficient to report her findings to her supervisor and to justify a further search.

The scope of LaMar's search was also reasonably contained. Upon finding presumptively offensive materials (such as a file labeled "pedophilia"), she then sought to

16

connect the files to a user.  When that was accomplished, Lopez notified Sgt. O'Brien, a

criminal investigator for the base, who, through his immediate commander, sought written

authorization, i.e., a search warrant, to search King's computer (TR. 50-60).  There is no

evidence that LaMar conducted a general search of all of King's files or that she made any

attempt to determine the existence of files beyond the purview of General Order-1.

Moreover, LaMar was the only person who searched the files; neither Lopez or Sgt. O'Brien

made any intrusion into King's files.  The search was thus justified as a legitimate workplace

search.

> [R]equiring an employer to obtain a warrant whenever the
> employer wished to enter an employee's office, desk, or file
> cabinets for a work-related purpose would seriously disrupt the
> routine conduct of business and would be unduly burdensome.
> Imposing unwieldy warrant procedures in such cases upon
> supervisors, who would otherwise have no reason to be familiar with
> such procedures, is simply unreasonable. In contrast to other
> circumstances in which we have required warrants, supervisors in
> offices such as at the Hospital are hardly in the business of
> investigating the violation of criminal laws. Rather, work-related
> searches are merely incident to the primary business of the agency.
> Under these circumstances, the imposition of a warrant requirement
> would conflict with "the common-sense realization that
> government offices could not function if every employment
> decision became a constitutional matter." *Connick v. Myers*, 461
> U.S. 138, 143 (1983).

*O'Connor v. Ortega*, 480 U.S. at 722.


**D.     *King's Expectation of Privacy in Search of Dormitory Room***

Before King can successfully prevail on his Fourth Amendment challenge to the

search of his dormitory room, he must meet two requirements.  First, he must demonstrate

that there was a search and seizure of his person, house, papers or effects, conducted by an agent of the government - i.e., he must demonstrate that there was an invasion of his reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347 (1967); *United States v. Glasgow*, 658 F.2d 1036, 1044 (5th Cir., Unit B, 1981). Second, he must demonstrate that the search and seizure were unreasonable. *Elkins v. United States*, 364 U.S. 206, 222 (1960). Both of the foregoing requirements are separate and distinct and both must be met before there can be any violation of an individual's rights guaranteed by the Fourth Amendment. *United States v. Bachner*, 706 F.2d 1121, 1125 (11th Cir. 1983) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 112, (1980)).

As aforestated, King challenges the search of his dormitory room and asserts an expectation of privacy with respect to its contents:

> Defendant King contends that the search and seizure of his private room of the military installation in the country of Saudi Arabia was conducted in violation of the Fourth Amendment to the United States Constitution. . . . Therefore, defendant has standing [to] challenge [the] admission of evidence seized.

(Doc. # 23, p. 4). Accordingly, the privacy question facing the court is whether King had an expectation of privacy in his *dormitory room*, not his computer.[19]  The court is persuaded

---

[19] The government, like the court, also misread King's challenge. Its argument on the issue of expectation of privacy focuses on King's computer and his computer files (Doc. # 31, pp. 3-4). Indeed, in a section entitled "King Had No Reasonable Expectation of Privacy", the government argues that King's "files were literally available to everyone". While the court does not necessarily disagree with that proposition, it is displaced  - as was the court's finding at the hearing -  as a counter-proposition to King's privacy claim, though useful on the issue of the propriety of the warrantless examination of his computer files, discussed *supra*.

that, because of the circumstances of King's occupancy of the room, he had a legitimate expectation of privacy.

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 1, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S. Ct. 421, 430 n. 12, 58 L. Ed. 2d 387 (1978).

***Bachner,*** 706 F.2d at 1126.

A dormitory room, especially one occupied by a person who, like King, is not confined thereto by force,[20] is a private space within the meaning of the Fourth Amendment.

> A dormitory room is analogous to an apartment or a hotel room. It certainly offers its occupant a more reasonable expectation of freedom from governmental intrusion than does a public phone booth. The defendant rented the dormitory room for a certain period of time, agreeing to abide by the rules established by his lessor, the University. As in most rental situations, the lessor . . . . reserved the right to check the room for damages, wear and unauthorized appliances. Such right of the lessor, however, does not mean [the defendant] was not entitled to have a 'reasonable expectation of freedom from governmental intrusion'

---

[20]The Supreme Court has determined that "a right to privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." ***Hudson v. Palmer***, 468 U.S. 517, 527-28, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *see also **Marsh v. Dep't of Children & Families***, 2006 U.S. Dist. LEXIS 60349 (D. Fla. 2006).  Those interests are not paramount in this case.

> or that he gave consent to the police search, or gave the [lessor]
> authority to consent to such a search.

***Benefield v. Bd. of Piazzola v. Watkins***, 214 F.Supp. 2d 1212, 1227 (N.D. Ala.) (citing

***Piazzola v. Watkins***, 442 F.2d 284, 287-289 (5th Cir.1971).

The court thus concludes that King had an expectation of privacy in his dormitory room and standing to challenge the sufficiency of the government's warrant to search it. It remains to be seen, however, whether the warrant or the search violated the Fourth Amendment.


**D.    *Probable Cause to Conduct the Search of Dormitory Room***

The Fourth Amendment does not require absolute mechanical precision -- the standard is probable, not infallible, cause. ***Hill v. California,*** 401 U.S. 797, 804 (1971) ("probable cause ... is a doctrine of reasonable probability and not certainty."). "To satisfy the probable cause standard, the government must reveal facts that *make it likely* that the items being sought are in that place when the warrant issues." ***United States v. Harris***, 20 F.3d 445, 450 (11th Cir. 1994)(emphasis added). The focus of the probable cause analysis is not, of course, on a single factor. "Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully reduced to a neat set of legal rules." ***Illinois v. Gates***, 462 U.S. 213, 231 (1983).

A court reviewing the issuance of a search warrant is not to conduct a *de novo* probable cause determination, but is merely to decide whether the evidence viewed as a whole provided a "substantial basis" for the finding of probable cause at the time the warrant

was issued.  *Massachusetts v. Upton*, 466 U.S. 727, 732-33 (1984)(per curiam); *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The reviewing court must decide whether there was a "substantial basis" solely upon consideration of the information presented to the issuing judicial officer.  *United States v. Lockett,* 674 F.2d 843 (11th Cir. 1982).  In conducting such a review, the court must give deference to the decision of the issuing judge even in marginal or doubtful cases.  *Id*. at 845.

In the instant case, the evidence presented to Col. Dozier, the issuing official, was clear and substantial.  The court will not review LaMar's findings, set forth in detail *infra*. It is enough to reiterate that the specific files that she found, including a "porn video" (TR. 38), combined with the "explicit stories" (Id.), gave rise to probable cause to believe that a seizure and search of King's computer would lead to the discovery of other offensive material.

Sgt. O'Brien's affidavit (Doc. # 23) track's LaMar's preliminary findings.  He stated that Lopez reported the finding of "sexually explicit material", that the computer belonged to Michael King, that LaMar had determined the computer's location, and that the computer contained an

> hour and a half long pornographic video . . . . as well as over a [sic]1000 text files containing pornographic stores.  Of these 1000 text files, approximately 400-500 of them deal with child pornography.

(Doc. # 23).

Probable cause to search a residence exists when "there is a fair probability that

contraband or evidence of a crime will be found in the particular place." *Illinois v. Gates*, 462 U.S. at 238. "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990). In this case, the information known about the computer files created a fair probability that other offensive materials would be found in a search of the actual computer. *See United States v. Martinelli*, 454 F.3d 1300, 1305-1306 (11th Cir. 2006) and *United States v. Campbell*, 2006 U.S. App. LEXIS 21209 (11th Cir. 2006).

**E.**    ***Neutral and Detached Magistrate*** /

King grounds his challenge to the neutrality of the military magistrate solely on the proposition that, as the supervisor of the investigating officer, Col. Dozier, the military magistrate, was not neutral or detached. Citing solely to *U.S. v. U.S. District Court for Eastern Dist. Of Mich., Southern Division*, 407 U.S. 443 (1971), King alleges that, as Lopez' and LaMar's supervisor, Col. Dozier was not neutral and detached.

King has not carried his burden of proving that Col. Dozier was not neutral and detached. Where a search is conducted under the authority of a warrant, the defendant challenging the search carries the burden of showing the warrant to be invalid. *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).[21] Although he testified at length about

---

[21]In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the

his qualifications and about the events leading to the search of his dormitory room, King

offered no evidence regarding Col. Dozier's position, her command relationship with Lopez

and LaMar, or any other evidence upon which the court could base a conclusion that she

either was or was not neutral or detached.

All that King asserted in his motion was that "[i]t  appears from the discovery

provided defendant that Co. Dozier who issued the search warrant was the supervisor of the

affiant, Inv. O'Brien".  On that assumption alone, the court cannot find that Col. Dozier was

not neutral and detached.


### III.   CONCLUSION

For all of the foregoing reasons, it is the RECOMMENDATION of the Magistrate

Judge that King's Motion to Suppress be DENIED.

It is further

ORDERED that the parties shall file any objections to this Recommendation on or

before **19 October 2006.**  A party must specifically identify the findings in the

Recommendation to which objection is made; frivolous, conclusive, or general objections

will not be considered.  Failure to file written objections to the Magistrate Judge's proposed

findings and recommendations shall bar a party from a de novo determination by the District

---

former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See* *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also* *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*).

DONE this 5th day of October, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED  STATES  MAGISTRATE  JUDGE